**ALABAMA NURSING HOME ASSOCIATION, etc. et al., Plaintiffs-Appellants,**

v.

**Patricia Roberts HARRIS, Secretary of Health and Human Services et al., Defendants-Appellees,**

v.

**ALABAMA EDUCATION ASSOCIATION et al., Intervening Defendants-Appellees.**

No. 79–1694.

United States Court of Appeals, Fifth Circuit.

May 7, 1980.

See also 617 F.2d 385 (5th Cir. 1980).

John W. Kelly, III, Stanley B. Sikes, Selma, Ala., for plaintiffs-appellants.

Eugene Tillman, Dept. of H. E. W., Human Resources Div., Jeffrey Golland, Robert Jaye, Washington, D. C., Kenneth E. Vines, Asst. U. S. Atty., Montgomery, Ala., for Joseph A. Califano, Jr., etc.

Herman H. Hamilton, Jr., William K. Martin, Sp. Asst. Attys. Gen., Henry C. Barnett, Jr., Montgomery, Ala., for Forrest James and all State defendants-appellees.

Before CHARLES CLARK, RONEY and HENDERSON, Circuit Judges.

CHARLES CLARK, Circuit Judge:

The Alabama Nursing Home Association and nine non-member institutions doing business in the long-term health care industry in Alabama[1] brought this action challenging the Medicaid reimbursement methodology currently used in the State of Alabama. They contended that (1) the Alabama program does not comply with 42 U.S.C. § 1396a(a)(13)(E), which requires reasonable cost related reimbursement, (2) the State of Alabama breached the federally required assurance of payment provision contained in the reimbursement plan, and (3) the Department of Health, Education, and Welfare[2] failed to comply with its statutory and regulatory duties to approve and validate the plan's payment methodology. The district court entered judgment for the defendants and the plaintiffs appealed.[3] We reverse the district court's judgment on the issue of HEW's failure to perform its statutory and regulatory duties, vacate the district court's judgment on the remaining issues, and remand this action to the district

---

1. The district court certified this as a class action brought on behalf "of all skilled nursing and intermediate care facilities located in Alabama which are provider institutions under the Medicaid Program."

2. Congress redesignated the Department of Health, Education, and Welfare as the Department of Health and Human Services. *See* Department of Education Organization Act, § 509,

20 U.S.C. § 3508. All agency acts relevant to this appeal predated the redesignation. In this opinion we refer to the executive department as "the Department of Health, Education, and Welfare" or "HEW."

3. This appeal was consolidated for oral argument with *Alabama Nursing Home Ass'n v. Harris,* 617 F.2d 385 (5th Cir., 1980).

court for further proceedings consistent with this opinion.

## I. FACTS

On February 1, 1977, the plaintiffs brought this action against various state and federal officials and departments charged with administering the Medicaid program in the State of Alabama. They charged that the reimbursement rate ceilings then in effect[4] failed to provide reimbursement "on a reasonable cost related basis" as required by § 1396a(a)(13)(E). In a memorandum opinion dated July 12, 1977, the district court held that the payment methodology utilized by the State of Alabama violated § 1396a(a)(13)(E). *Alabama Nursing Home Ass'n v. Califano*, 433 F.Supp. 1325 (M.D.Ala.1977). The district court enjoined the defendant state officials from failing to submit to HEW within sixty days a plan complying with the requirements of § 1396a(a)(13)(E) and from failing to implement the plan once it was approved by HEW.

The state submitted to HEW a proposed reimbursement plan that was approved on December 9, 1977. The plan, as amended, provides for the prospective reimbursement of provider institutions on a class basis and fixes a ceiling on reimbursement equal to the projected billing rate of the sixtieth percentile facility in each class.[5]

On March 21, 1978, the plaintiffs filed a supplemental complaint challenging the December 9, 1977, plan. They argued that the payment methods and standards established in the plan do not result in reasonable cost related reimbursement within the meaning of § 1396a(a)(13)(E), that the State of Alabama breached the federally required assurance of payment provision contained in the reimbursement plan, and that HEW failed to comply with its statutory and regulatory duties to approve and validate the plan's reimbursement methodology.

The district court rejected the plaintiffs' contentions and the plaintiffs appealed.

## II. STATUTORY AND REGULATORY REQUIREMENTS

In 1972, Congress amended Title XIX of the Social Security Act to require that a state plan for long-term health care assistance provide

for payment of the skilled nursing facility and intermediate care facility services provided under the plan on a reasonable cost related basis, as determined in accordance with methods and standards which shall be developed by the State on the basis of cost-finding methods approved and verified by the Secretary of HEW].

Social Security Amendments of 1972, § 249(a), 42 U.S.C. § 1396a(a)(13)(E). Sub-

---

**4.** Provider institutions received reimbursement on a per patient, per day basis. The rate of reimbursement could not exceed an absolute ceiling regardless of the institution's costs. At the time this action was initiated, a skilled nursing facility could receive a maximum of $21.50 per patient, per day, while an intermediate care facility could receive a maximum of $19.35 per patient, per day.

**5.** The reimbursement plan covers three distinct time periods, establishing different payment methodologies for each period. Only the methodology established for the period January 1, 1978, and beyond is relevant to this action.

Under the plan, as amended, each provider institution annually files a cost report itemizing its allowable costs for the previous twelve-month period. *See* 42 C.F.R. § 450.30(a)(3)(i) (1977). The Alabama Medical Services Administration then reviews the cost reports to ensure that they are mathematically accurate and report only allowable costs. *See id.* § 450.-

30(a)(3)(ii). *See generally id.* § 450.30(a)(3)(iii). Based on these reports, the Administration projects a per patient, per day reimbursement rate for each institution. It then divides provider institutions into three classes: skilled nursing facilities, intermediate care facilities, and combination facilities. The Administration ranks the institutions in each class from lowest to highest based on each institution's projected reimbursement rate. Under the plan, provider institutions in the lower sixtieth percentile in each class receive reimbursement for Medicaid services at their full, individual projected rates. The remaining institutions are reimbursed at the projected billing rate of the sixtieth percentile facility in their class regardless of their individual projected rates. The sixtieth percentile ceilings in effect on February 23, 1979, resulted in a per patient, per day reimbursement rate of $24.00 for skilled nursing facilities, $20.44 for intermediate care facilities, and $22.87 for combination facilities.

sequent regulations read in the context of congressional intent amplify and define the specific requirements of this section.

### A. Reasonable cost related basis

■■ Congress intended that state authorities in developing methodologies for reasonable cost related reimbursement have great flexibility in the areas of cost-finding and rate-setting. The legislative history indicates that states are to be free to experiment with methods and standards for payment that would be simpler and less expensive than the complex Medicare reasonable cost formula. See S.Rep.No.92–1230, 92d Cong., 2d Sess. 287 (1972) (hereinafter "Senate Report"). See also 43 Fed.Reg. 4,861 at 4,862 (1978); 41 Fed.Reg. 27,300 at 27,300–02 (1976). Congress approved the setting of reasonable cost related rates on either a prospective or retrospective basis. See Senate Report at 288. See also 43 Fed.Reg. at 4,861–63. Congress similarly approved the setting of payment rates on a geographical, class, or facility-by-facility basis. See Senate Report at 287–88. See also 43 Fed.Reg. at 4,862–64; 41 Fed.Reg. at 27,304. Additionally, Congress intended that states have freedom both to define allowable cost items and to set a value on the reasonable cost of such items. See Senate Report at 287. See also Fed.Reg. at 27,303.

■ As a result of the flexibility that states possess in these areas, a state may select its reasonable cost related reimbursement rate from a spectrum of acceptable figures. As HEW has observed,

a variety of cost-finding methods could be used to determine reasonable cost, which methods would produce a range of amounts representing reasonable cost. Rather than any one figure representing reasonable cost, each figure within the acceptable range represents a reasonable cost.

41 Fed.Reg. at 27,301. See also 43 Fed.Reg. at 4,862; 41 Fed.Reg. at 27,303. This acceptable range of reasonable cost related rates is not without bounds, however.

The Senate Report makes clear Congress' concern over the effect that both underpayment and overpayment have on the quality of care given at long-term health care facilities.[6] Recognizing these concerns, HEW formulated regulations that prescribe definitive upper and lower limits on the acceptable range of reasonable cost related reimbursement rates. Pursuant to these regulations, a state may set its payment rate no "lower than the level which the State reasonably finds, or in the case of a prospectively determined rate, the level which the State reasonably expects, to be adequate to reimburse in full such actual allowable costs of a facility that is economically and efficiently operated." 42 C.F.R. § 450.-30(a)(3)(iv)(A) (1977).[7] See also 43 Fed.Reg. at 4,862; 41 Fed.Reg. at 27,302–04. Neither may it set a reimbursement rate higher than "the highest costs the individual provider . . . or the highest cost provider in the class . . . can reasonably be expected to incur, and which would be found reasonable if incurred." 43 Fed.Reg. at 4,862. See C.F.R. § 450.30(b)(6) (1977). See also 41 Fed.Reg. at 27,301–04. See generally 42 U.S.C. § 1396a(a)(30). Accord-

---

**6.** HEW amplified Congress' concerns when it observed:

> If facilities are underpaid, because a State's flat rate is unrealistically low or because in determining its rate the State refuses to recognize as allowable costs some of the real costs of providing the services, facilities will be under pressure to cut corners and provide lower quality care, or will be forced to make their non-medicaid patients absorb some of the cost of Medicaid patients' care; at worst, facilities may refuse to accept Medicaid patients. If facilities are overpaid, either because the State's flat rate is unrealistically high or because the State's payment formula permits reimbursement for unnecessary

> items such as luxury services, questionable depreciation allowances and the like, there is little incentive for providers to employ the most efficient and economical methods of providing services, with the result that the State's Medicaid dollars do not go as far as they could to provide needed medical care. 41 Fed.Reg. at 27,300.

**7.** The applicable federal regulations have been recodified and currently appear at 42 C.F.R. §§ 447.272 to .316 (1979). This opinion refers to the regulations as they appeared at the time Alabama's proposed reimbursement methodology was being formulated and approved.

ingly, to be approvable, a "State title XIX plan for reimbursement of long-term care facility services must provide for a method of determining payment rates which assures that all participating providers' payment rates will fall somewhere between the maximum and minimum reasonable cost related rates." 43 Fed.Reg. at 4,862–63.

### B.  *HEW's obligation*

█ Section 1396a(a)(13)(E) obligates HEW to approve and verify the cost-finding methods utilized in a state's reimbursement plan. However, Congress clearly intended that HEW's obligations to approve and verify extend beyond the cost-finding methods so as to encompass the state's proposed rate-setting methodology.

The States would use acceptable cost-finding techniques . . . to determine reasonable reimbursement and apply to the results appropriate methodologies for determining payment. *The methods would have to be approved and validated by the Secretary [of HEW].*

Senate Report at 287 (emphasis added). HEW previously has recognized and accepted this enlarged obligation.

The language of the Committee Report makes clear that *the State's methodologies for rate-setting, as well as the State's methods for cost-finding, are subject to the Secretary's approval.*

. . . In light of the concern expressed in the legislative history of section [1396a(a)(13)(E)] about the dangers to the objectives of the Medicaid statute of either underpayment or overpayment of long-term care facilities, *the Secretary [of HEW] in carrying out his statutory functions of reviewing, approving, and verifying the States' methodologies, has the responsibility to seek to assure that the methodologies will in fact result in reasonable cost-related reimbursement,*

. . . .

41 Fed.Reg. at 27,300 (emphasis added).

### C.  *Assurance of payment*

Federal regulations require that a state plan contain an express provision assuring that the State will pay to a provider of long term care facility services who furnishes services in accordance with the requirements of the State plan the amount determined for services furnished by the provider under the plan according to the methods and standards set forth in its plan . . . . .

42 C.F.R. § 450.30(a)(v) (1977).[8]

## III.  DISPOSITION

### A.  *HEW's obligations*

The appellants argue that HEW failed in its statutory and regulatory duties to approve and verify the payment methodology contained in the Alabama plan. The district court, believing that HEW's obligations did not extend so far as to require HEW to ensure that the payment methodology would in fact result in reasonable cost related reimbursement, determined that the plaintiffs failed to establish that the procedures utilized by HEW were improper. Because the evidence presented to the district court, when considered in light of the agency's proper statutory and regulatory duties, demonstrates that HEW failed to perform its obligations, we reverse.

█ A presumption of validity attaches to the actions of administrative agencies. *Mazaleski v. Treusdell,* 562 F.2d 701, 717 n. 38 (D.C.Cir.1977); *Maryland-National Capital Park & Planning Comm'n v. Lynn,* 514 F.2d 829, 834 (D.C.Cir.1975). *See Giles Lowery Stockyards, Inc. v. Department of Agriculture,* 565 F.2d 321, 326 (5th Cir. 1977), *cert. denied,* 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978). While the presumption is rebuttable, *Skinner v. United States,* 594 F.2d 824, 830 (Ct.Cl.1979), the burden of proof rests with the party challenging the agency's action. *Mazaleski v. Treusdell,* 562 F.2d at 717 n. 38; *Maryland-National Capital Park & Planning Comm'n v. Lynn,* 514 F.2d at 834. The appellants met that burden.

8.  *See* note 13, *infra.*

The evidence presented to the district court established that HEW's failure to review and validate the reimbursement methods and standards contained in Alabama's proposed plan was twofold. First, HEW failed to establish specific criteria or standards by which both state and federal officials could determine the meaning of crucial statutory and regulatory terms. In particular, HEW failed to define an "efficiently and economically operated" facility despite the fact that the minimum level of reasonable cost related reimbursement is to be measured by the full, actual, allowable costs of such an institution. Similarly, it neglected to formulate criteria by which to judge the reasonableness of the classes utilized in a proposed reimbursement methodology.

Second, HEW failed to review the payment methodology contained in the Alabama plan to ensure "that all participating providers' payment rates will fall somewhere between the maximum and minimum reasonable cost related rates."[9] 43 Fed. Reg. at 4,863. HEW never attempted to verify that the sixtieth percentile ceiling would, in fact, result in reasonable cost related reimbursement in Alabama. It did not require that the State of Alabama submit documentation or analysis showing that the plan's methods and standards actually produced a reimbursement rate that fell within the maximum and minimum allowable rates. Neither did it conduct an independent study or analysis to ensure that the Alabama plan complied with the statutory requirement.[10]

■ Despite these failings, HEW argues that its review was legally sufficient. It argues that the evidence shows a period of "constant, continuing contact and dialogue" between federal and state officials that permitted an "exchange of ideas and informa-

tion." It contends that its approval of the plan resulted from "the combined judgments of experienced individuals that the Alabama plan amendment is reasonable and legally sufficient." However, the evidence indicates that HEW's approval of the Alabama plan and its sixtieth percentile ceiling stemmed solely from the application of the agency's institutional assumption that any plan that reimburses at or above the projected billing rate of the median facility in a class meets the regulatory minimum reimbursement rate. The application of such an assumption does not satisfy the requirements of § 1396a(a)(13)(E).

■ On remand, the district court is instructed to refer the Alabama reimbursement plan to HEW for compliance with its regulatory duties. The district court should retain jurisdiction over this action to ensure that HEW develops specific criteria and standards regarding both "an economically and efficiently operated" facility and reasonable reimbursement classes. Additionally, the district court must ensure that HEW develops criteria and standards by which it is to determine whether the reimbursement rate specified in the December 9, 1977, Alabama plan is within the prescribed range of reasonable cost related reimbursement.

## B. *Reasonable cost related basis*

The appellants contend that the payment rate specified in the Alabama plan does not result in reasonable cost related reimbursement within the meaning of § 1396a (a)(13)(E) in that it fails to "reimburse in full such actual allowable costs of a facility that is economically and efficiently operated." They argue that the ceilings set by the Alabama plan are statistically invalid and were arbitrarily selected, that the sixtieth percentile ceilings were set without

---

**9.** Alabama officials selected the sixtieth percentile billing rate as the reimbursement ceiling solely upon the recommendation of regional HEW officials. Those officials based their recommendation on two factors: the Medicaid reimbursement plan in the State of Georgia contained a similar sixtieth percentile ceiling and a September 1977 HEW action transmittal referred approvingly to such a ceiling.

**10.** HEW conceded in its brief to the district court that it failed to review the cost center ceilings contained in the Alabama Nursing Home Reimbursement Manual. These ceilings place threshold limitations on certain allowable costs.

considering the cost center ceilings imposed by the Alabama Nursing Home Reimbursement Manual, and that the three reimbursement classes specified in the Alabama plan are not based on reasonable criteria. They introduced evidence indicating that the sixtieth percentile ceiling rates result in reimbursement below the mean rate in two of the three payment classes [11] and that, to meet the § 1396a(a)(13)(E) requirement of reasonable cost related reimbursement, a payment rate in Alabama would have to be set statistically between the mean rate plus one-half standard deviation and the mean rate plus one standard deviation.[12]

The district court held that the appellants failed to meet their burden of proof. We vacate that portion of the district court's judgment in view of our determination that this action must be referred to HEW for the performance of its statutory and regulatory duties, which includes in part, a threshold administrative determination of whether the payment methodology specified in the December 9, 1977, plan results in reasonable cost related reimbursement. We pretermit deciding and intimate no opinion whether the plan's payment rates comply with the requirement of § 1396a(a)(13)(E). Our disposition of this issue is without prejudice to the appellants' right to challenge the payment rates on remand should HEW, in the proper exercise of its agency duties, determine that the Alabama plan meets federal standards.

## C. *Assurance of payment clause*

The appellants argue that the State of Alabama violated the assurance of payment provision contained in the reimbursement plan by failing to appropriate sufficient funds for its Medicaid program. The district court determined that there could be no breach of the provision until the defendant state officials failed to make payments as specified in the plan. Because of events that have occurred since the district court decision, we vacate this portion of the district court's judgment and remand for further proceedings.

The assurance of payment provision contained in the Alabama plan [13] has two purposes. First, it assures that the state will, in fact, reimburse provider institutions for services rendered under the plan. Second, it assures that such reimbursement, when made, will be made on a reasonable cost related basis within the meaning of § 1396a(a)(13)(E).

As HEW observes, a state may not assure anything less than reasonable cost related reimbursement.

[A] State would not satisfy the requirement of section [1396a(a)(13)(E)] if it . . . gave assurance to pay, the amount determined under this section to the extent State funds are available, or to the extent that State appropriations permit. To allow a State to limit its obliga-

---

11. The appellants presented the affidavit of Richard Kahan, a research consultant in the areas of medical economics and health systems planning. His analysis of the per diem costs of health care facilities in Alabama produced the following statistical information:

| Class of Homes | Mean Rate | Sixtieth Percentile Ceiling Rate |
|---|---|---|
| Skilled Nursing Facility | $24.55 | $24.00 |
| Combination Facility | 23.02 | 22.87 |
| Intermediate Care Facility | 19.29 | 20.44 |

12. Kahan's analysis of the per diem costs of health care facilities in Alabama produced the following statistical information:

| Class of Homes | Mean Rate Plus One-Half Standard Deviation | Mean Rate Plus Three-Fourths Standard Deviation | Mean Rate Plus One Standard Deviation |
|---|---|---|---|
| Skilled Nursing Facility | $26.53 | $27.51 | $28.50 |
| Combination Facility | 24.64 | 25.44 | 26.25 |
| Intermediate Care Facility | 20.78 | 21.52 | 22.26 |

13. The assurance of payment clause contained in the Alabama plan parallels the language of 42 C.F.R. § 450.30(a)(v), see text accompanying note 8, *supra* at ——, and provides that:

The State will pay each provider of nursing care services, who furnishes the services in accordance with the requirements of the

tion under the statute by such a provision, . . . would permit a State to defeat a major part of Congress' purpose in enacting section [1396a(a)(13)(E)].

41 Fed.Reg. at 27,303.

The Medicaid program in Alabama has a history of financial crisis and inadequate funding that stems from the ongoing refusal of the Alabama Department of Health to permit the Alabama Medical Services Administration to submit an adequate budget request to the state legislature. During 1976 and 1977, the state's Medicaid program failed to comply with the § 1396a(a)(13)(E) requirement of reasonable cost related reimbursement because the legislature had failed to appropriate sufficient funds to pay for the increase in expenditures that would result from compliance with the statute. In August and September, 1977, the state imposed a ten percent cutback on reimbursement payments because of inadequate state funding. During fiscal 1978, the Alabama Medicaid program operated despite a projected budget deficit of over $4,900,000. As a result of a similar budget deficit during the past fiscal year, the State of Alabama did not reimburse provider institutions for services rendered in July, August, and September, 1979, until the beginning of this fiscal year, October 1, 1979. While counsel advises that all provider institutions have now received the reimbursement payments specified in the plan, it appears that Alabama again is operating with a projected budget deficit that ultimately will result in the delay or reduction in Medicaid reimbursement payments.

 A state is not obligated to participate in the Medicaid program. However, once it has voluntarily elected to participate in the program, the state must comply with federal standards. *Florida v. Matthews*, 526 F.2d 319, 326 (5th Cir. 1976); *Rodriguez v. Vowell*, 472 F.2d 622, 624 (5th Cir.), *cert. denied*, 412 U.S. 944, 93 S.Ct. 2777, 37 L.Ed.2d 404 (1973); *Reyna v. Vowell*, 470 F.2d 494, 496 (5th Cir. 1972). Inadequate state appropriations do not excuse noncom-

pliance. A state may not circumvent its previous guarantee of reasonable cost related reimbursement by failing to take requisite steps to ensure adequate funding of the program's projected expenditures.

On remand, the district may, on an appropriate motion and a proper record, grant such relief as is necessary and appropriate.

REVERSED in part, VACATED in part, and REMANDED.

---

State plan, the amount determined for services furnished by the provider under the Plan according to the methods and standards set forth in [the Plan].