678 F.2d 716
 EDGEWATER NURSING CENTER, INC., an Illinois corporation, Sam
Gorenstein, David Gorenstein and Sidney
Gorenstein, d/b/a Edgewater Real Estate
Partnership, Plaintiffs-Appellants,
v.
Jeffrey C. MILLER, Director, Illinois Department of Public
Aid, and George Holland, Regional Administrator of the
Health Care Financing Administration, as Agent for the
Secretary of Health and Human Services, Defendants-Appellees.
 No. 81-2512.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 6, 1982.
Decided May 18, 1982.
 
 Abigail K. Spreyer, Chicago, Ill., for plaintiffs-appellants.
 James C. O'Connell, Welfare Litigation Div., Frederick H. Branding, Asst. U. S. Atty., Chief, Civ. Div., Chicago, Ill., for defendants-appellees.
 Before BAUER and POSNER, Circuit Judges, and GRANT, Senior District Judge.*
 POSNER, Circuit Judge.
 
 
 1
 This case involves a challenge to one feature of Illinois' method of reimbursing the costs of nursing homes that serve Medicaid patients.
 
 
 2
 In 1972 Congress passed a statute requiring every state that wanted to participate in the Medicaid program to adopt, by July 1, 1976, a plan for payment of services "on a reasonable cost related basis, as determined in accordance with methods and standards which shall be developed by the State on the basis of cost-finding methods approved and verified by the Secretary (of Health, Education and Welfare, now of Health and Human Services) ...." 42 U.S.C. § 1396a(a)(13)(E). Illinois missed the deadline but finally on December 29, 1977, submitted its proposed plan to what is now the Department of Health and Human Services. The plan went into effect two days later, on January 1, 1978, and was approved a few months later by the Secretary.
 
 
 3
 Illinois' plan bases reimbursement on both operating costs and capital costs (such as depreciation, property taxes, and rental costs), but only the method of reimbursing capital costs is at issue on this appeal. Under the plan, those costs are not determined, as one might expect, on an individual-facility basis. Rather, all the nursing homes in the state are first grouped by area and then, within each area, by the year either of construction or of latest acquisition. The median capital costs for each area-year of facilities (e.g., Chicago-1975) are then computed. A nursing home whose actual capital costs are lower than the applicable median gets the median-this is the carrot to encourage economical capital management. A nursing home whose actual capital costs exceed the applicable median gets 80 percent of the excess but in no event more than eight percent above the median. So if the median were $1 per patient, a nursing home whose actual capital costs were $1.10 would get $1.08, but a nursing home whose actual capital costs were $1.11 would also get $1.08. The 80 and eight percent limitations are the stick.
 
 
 4
 The plaintiffs do not challenge this ingenious scheme for creating incentives for the economical operation of Medicaid facilities. Their only objection is to the vintage in which the scheme placed their facility, the Edgewater Nursing Home. When they acquired it on July 28, 1977, the state's reimbursement plan was still in its formative stage. The plan ultimately adopted provided that for the purpose of classifying facilities by year of construction or latest acquisition any acquisition after July 1, 1977, would be ignored and the last acquisition before that date would be used instead. The Edgewater home had been acquired by plaintiffs' predecessors in 1972, so that the plan grouped it with facilities constructed or last acquired in 1972, when prices (and hence capital costs) of nursing homes were considerably lower than in 1977. Under the state's plan, subsequent sales of facilities classified in a particular year will raise the median for subsequent rate years, but they will never put the plaintiffs in as good a position as they would be if the Edgewater home had been classified with facilities constructed or last acquired between January 1 and June 30, 1977.
 
 
 5
 The plaintiffs brought this suit against the responsible state and federal officials seeking a declaration that the July 1, 1977, cut-off date was invalid. They argue that it violates the statute in two respects: it was not "verified" by the Secretary of Health and Human Services; in any event, it did not have a "reasonable cost related basis," so that the Secretary could not properly have approved it even if he had verified it. Both sides moved for summary judgment, the defendants successfully.
 
 
 6
 The plaintiffs emphasize the alleged unfairness of applying the cut-off date to them. They say that in acquiring the Edgewater home on July 28, 1977, they relied on the fact that state officials had given no indication that the plan submitted to the federal government would include a retroactive cut-off date, and had in fact indicated the contrary. But however great a surprise it may have been, the retroactive cut-off date could not have disappointed any reasonable expectation of these plaintiffs and so have been unfair.
 
 
 7
 When the plaintiffs acquired the nursing home on July 28, 1977, they could not have known the terms on which their capital costs would be reimbursed, because the state's plan had not yet been developed, let alone submitted to and approved by the federal government. Whatever those terms were, they would be applied retroactively to these plaintiffs. And they could have been highly unfavorable terms even without a cut-off date. The statute requires only that a plan have a reasonable cost-related basis. The plaintiffs could not have known how they would fare under so elastic a standard. New York State had prior to July 28, 1977, adopted a plan that would have been even less favorable to these plaintiffs than the Illinois plan with its retroactive cut-off date, because the New York plan based capital-costs reimbursement on net depreciated value, ignoring acquisitions altogether. See Hempstead Gen. Hosp. v. Whalen, 474 F.Supp. 398, 404 (E.D.N.Y.1979), aff'd mem., 622 F.2d 573 (2d Cir. 1980). Applied to the Edgewater home, the New York approach would have based capital-costs reimbursement not on the purchase price in 1972, but on the original cost of the home, as depreciated-presumably an even lower figure.
 
 
 8
 The plaintiffs could not have known how closely Illinois might imitate New York. They were taking a shot in the dark when they signed a lease before waiting for the Illinois plan to be formulated and adopted, and they will not be heard to complain that they were treated unfairly just because the plan turned out to be less favorable to them than they had hoped it would be.
 
 
 9
 Nevertheless, although the plaintiffs were not treated unfairly, they have standing to challenge any feature of the state's plan that violates the statute to their detriment. The defendants' counsel conceded at oral argument that every feature of the plan, including the July 1, 1977, cut-off date as applied to classify the Edgewater home with facilities constructed or last acquired in 1972, must meet the statutory requirements of (1) having a reasonable cost-related basis and (2) being verified by the Secretary of Health and Human Services. The second requirement is a backstop for the first. It is not enough that a plan have in its every particular a reasonable cost-related basis; the Secretary must verify that it does. He must require the state to submit sufficient data to enable him to determine that the plan has such a basis, and then he must make that determination. See Alabama Nursing Home Ass'n v. Harris, 617 F.2d 388, 394 (5th Cir. 1980).
 
 
 10
 Since most of the evidence showing that the various components of the Illinois plan had a reasonable cost-related basis presumably would have been submitted to the Secretary as part of the verification process, we first consider whether he in fact verified the July 1 cut-off provision. Verification is an example of informal agency decision-making. Because it does not produce the kind of tidy written record on which judicial review of formal agency action is based, the district court had to reconstruct the factual basis of the Secretary's action from affidavits of his subordinates and of the state officials with whom they dealt. See Hospital Ass'n of N. Y. State, Inc. v. Toia, 473 F.Supp. 917, 927 (S.D.N.Y.1979).
 
 
 11
 To verify that the July 1, 1977, cut-off date in the Illinois plan was reasonably cost-related, the Secretary had, we think, to consider three questions:
 
 
 12
 (1) Should there be any cut-off date earlier than the date the plan was announced?
 
 
 13
 (2) If so, what should that date be?
 
 
 14
 (3) For nursing homes acquired after the cut-off date, what would be a reasonable vintage in which to reclassify them?
 
 
 15
 No written material pertinent to these questions was either submitted to the Department of Health and Human Services by the State of Illinois or complied by the Department itself. The record made in the district court consists entirely of recollections of state and federal officials involved in the formulation and approval of the state's plan. All that we are able to find in this record bearing on the first question is that a retroactive cut-off date was thought appropriate to avoid rewarding people who had paid inflated prices for nursing homes in the expectation of being fully reimbursed in the plan ultimately adopted by the state. No evidence was presented to the Department that transactions at inflated prices had ever occurred in Illinois. Yet the phenomenon could not simply be presumed; it would take a daring speculator to pay an exorbitant price for a nursing home before he knew the basis on which the state would reimburse him for his capital costs.
 
 
 16
 With respect to the second question-the choice of July 1, 1977, as the cut-off date-no evidence at all was presented to the Department, so far as the record below reveals. Of course once it was decided to have a retroactive cut-off date the choice of the date would have to be arbitrary to some extent. But it seems in this case to have been totally so. A federal official recalled having thought the date "reasonable in its timeliness as being contemporary with the period during which the plan was being submitted for (HHS) approval." But since Illinois first submitted a proposed plan on January 4, 1977, the objective of "contemporaneity" would have been satisfied by any cut-off date in 1977. If the concern was with transactions at inflated prices, one might have expected the Secretary to collect data on recent sales of nursing homes in Illinois and determine from those data when (if ever) those prices had begun to rise at a faster rate than could be explained by factors other than that a state plan was expected to go into effect soon. This was not done.
 
 
 17
 The record below suggests that the third question was not considered at all. Even if the reasonableness of a July 1, 1977, cut-off date is accepted, it is difficult to understand why a nursing home bought on July 2, 1977, should be classified with homes built or last acquired in 1972 rather than with homes built or last acquired in the first six months of 1977. If the Edgewater Nursing Home had been built in 1900 and thereafter not acquired until July 28, 1977, it would have been classified with other nursing homes built in 1900, while if it had been acquired on June 28, 1977, it would have been classified with nursing homes built or last acquired in the first six months of 1977. This treatment seems irrational but perhaps is not-we cannot tell because the Secretary failed to give this most curious feature of the state's plan even perfunctory consideration.
 
 
 18
 On the basis of the record compiled below, we conclude that the Secretary failed to comply with his statutory obligation of verifying the July 1, 1977, cut-off date in the Illinois plan, because he did not undertake a sufficient inquiry to be able to determine whether that date was reasonably cost-related. Nor does the record contain other evidence from which we might infer that the date was reasonably cost-related, even though not verified. If the only problem were verification, the appropriate remedy would be to send the Illinois plan back to the Secretary for verification of the questioned feature of it, as in Alabama Nursing Home Ass'n, supra, 617 F.2d at 394-95. But if the Secretary could not lawfully have approved the plan because it did not have a reasonable cost-related basis, the appropriate remedy is a permanent injunction.
 
 
 19
 Either remedy, however, would be premature. Although the defendants' motion for summary judgment should have been denied, it does not follow that the plaintiffs' motion should have been granted. We are not certain that the record, made as it was on cross-motions for summary judgment, is complete. The defendants should have an opportunity to supplement it if they want to show that the Secretary actually had a fuller record before him than the affidavits disclose, or if they want to present additional evidence that the cut-off date was reasonably cost-related. Evidence that was not before the Secretary may not be used to show that he carried out his statutory obligation of verifying the cut-off date, but it could show that the date does have a reasonable cost-related basis, which could as we have said affect the choice of remedy. If the defendants do not present additional evidence of either type, then the plaintiffs are entitled to a permanent injunction against the application of the July 1, 1977, cut-off date to the Edgewater home.
 
 
 20
 REVERSED AND REMANDED.
 
 
 
 *
 Of the Northern District of Indiana